

# Fourth Court of Appeals

### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00320-CR

Ethan Carl **BECKMAN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 25th Judicial District Court, Guadalupe County, Texas
Trial Court No. 23-0508-CR-A
Honorable Heather H. Wright, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:        Irene Rios, Justice
             H. Todd McCray, Justice
             Velia J. Meza, Justice

Delivered and Filed: May 20, 2026

AFFIRMED

Appellant Ethan Carl Beckman appeals his murder conviction[1] raising three appellate

issues. Specifically, Beckman challenges the sufficiency of the evidence to support his murder

---

[1] Beckman was also convicted of tampering with evidence; however, he does not challenge the sufficiency of the evidence supporting that conviction, and Beckman's request for a lesser-included offense instruction only applies to his murder charge. With respect to Beckman's suppression complaint, we assume our resolution pertains to both convictions. However, we need not separately address both convictions within our discussion of the suppression issue. Thus, we do not further address Beckman's tampering with evidence conviction in this opinion apart from our conclusion that having overruled all of Beckman's appellate issues, we affirm both his murder and tampering with evidence convictions.

conviction, argues the trial court erred by denying his motion to suppress, and contends the trial court erred by denying his request to include a lesser-included offense in the jury charge. We affirm.

## BACKGROUND

Late one night, Beckman picked up his childhood friend Jacob Dubois to drive around and talk. When Jacob did not return later that night, Jacob's girlfriend tried to contact him but could not reach him. Becoming increasingly worried, Jacob's girlfriend contacted Jacob's mother, and they began to look for Jacob with no success. Jacob's girlfriend and mother tried speaking to Beckman. He initially avoided them but then provided differing accounts of what happened. Soon thereafter, police opened a missing persons case. Within days of Jacob's disappearance and following significant discoveries by the police, the case became a murder investigation focused on Beckman as the suspect.

Subsequently, Beckman was charged and convicted by a jury for murder. Accepting the recommendation of the jury, the trial court sentenced Beckman to ninety-nine years in prison for murder. Beckman appeals.

## LEGAL SUFFICIENCY

Because sufficiency is a rendition issue, we first address Beckman's sufficiency challenge to the evidence supporting his murder conviction. Beckman argues no evidence indicates he engaged in any "particular conduct or committed any specific act" directed at Jacob that caused his death. Arguing the record is devoid of this "death-causing act," Beckman further claims the evidence is insufficient to prove he acted intentionally or knowingly in causing Jacob's death.

*A.  Standard of Review and Applicable Law*

When reviewing the sufficiency of the evidence, we determine whether, "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

This standard coincides with the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The factfinder may and should draw "reasonable inferences" from the evidence but may not draw conclusions based on "mere speculation." *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007).

The factfinder alone judges the evidence's weight and credibility. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). We may not reevaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). We must presume the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *See id.*; *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (reviewing court must not sit as thirteenth juror). "Although the parties may disagree about the logical inferences that

flow from undisputed facts, where there are two permissible views of the evidence, the [factfinder]'s choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (internal quotations omitted).

Direct evidence of the elements of the offense, including the culpable mental state, is not required. *See Hooper*, 214 S.W.3d at 14. As stated above, the jury is permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor. *See id.* at 14–15. Circumstantial evidence alone may be sufficient to establish guilt. *See id.* at 15.

Under the Penal Code and relevant to the facts of this case, a person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual, or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

To establish murder, the State must prove the defendant had a "conscious objective or desire" to cause the death or had an awareness that the "conduct is reasonably certain to cause" the death. *See id.* § 6.03(a), (b); *see also id.* § 19.02(b)(1), (2).

*B. Relevant Facts*

Holly, Jacob's girlfriend, testified that she and Jacob lived together and had been dating for over a year prior to his death. On the night of March 7, 2021, Holly and Jacob had plans after Jacob got home from work, but Beckman contacted Jacob asking if they could talk instead. At approximately 11:30 p.m., Jacob left to meet Beckman; Holly expected Jacob to return within a couple hours.

After she had not heard from Jacob in hours, Holly checked his location at 3:30 a.m. and became concerned when Jacob's phone provided no location. Jacob's phone showed no location

at 5:30 a.m. either, and Holly's messages were not delivered to Jacob's phone. At 10:00 a.m. on March 8th, Holly contacted Jacob's mother Sylvia and told her that Jacob had gone out the night before and not come home. Holly attempted to contact Beckman, but he did not respond. Holly and Sylvia drove to his apartment Holly noticed the front license plate of Beckman's car was bent, and the front bumper appeared missing. Holly tried to look inside the car's windows, but the tint was too dark. Holly and Sylvia knocked loudly on Beckman's apartment door for five minutes, but no one answered. After leaving and returning to Beckman's apartment within twenty minutes, Beckman's car was gone. Beckman eventually returned Holly's message and told her that he had dropped off Jacob at his house. When Holly asked to talk to Beckman, he claimed he had been in an accident and turned off his phone.

Sylvia and Holly attempted to file a missing persons report on March 8th, but the police informed them it was too early to make the report. Beckman then began providing different versions of where he dropped Jacob off the night he went missing. For example, Beckman stated he dropped Jacob off at his house, then, at the corner and Jacob walked home, and then, at another girlfriend's place but would not identify the location. Upon checking Jacob's social media accounts, Holly discovered Jacob and Beckman were no longer associated with each other on the only account they had previously been linked, and as of 11:38 p.m. on March 7th, Jacob had no communications on his social media accounts, which was unusual for him.

Holly acknowledged she did not care for Beckman primarily because he and Jacob used drugs together. Holly described Beckman as volatile and as someone who bullied and belittled Jacob if Jacob would not participate in drug use or other activities. Holly explained that during the previous months Jacob had been distancing himself from Beckman.

Chloe, Holly's best friend, testified that Holly and Jacob had an amazing relationship and they lived with Chloe and her family. Chloe last saw Jacob at work the night of March 7th and his behavior appeared normal. Chloe contacted Beckman twice on March 8th, asking about Jacob. During their first conversation, Beckman told her that Jacob no longer liked Chloe or Holly and no longer wanted to be around them. Chloe tried asking Beckman for more details during their second conversation, but he provided none. Chloe described Beckman's demeanor as "[i]mmediately defensive, lacking empathy. He didn't really care that his friend was missing."

David, Chloe's father, also testified Holly and Jacob had a good relationship. David saw Jacob before he left to meet Beckman. Jacob told David it would be a short visit, less than an hour, and they would be staying in the neighborhood. David also spoke with Beckman several times attempting to find Jacob. First, Beckman told David that Jacob left because he was tired of Holly and his life. Beckman then provided David with several different stories about Jacob's potential whereabouts, ranging from Jacob moving to Colorado, getting on a bus, and Beckman dropping him off in David's neighborhood. During a video call, David accused Beckman of killing Jacob. According to David, Beckman responded with an "uncomfortable giggle" and asked David why would he kill Jacob.

Herman, who knew Beckman through his roommate Gabriel, testified Beckman came to Herman and Gabriel's apartment on the southside of San Antonio on March 8, 2021 at approximately 1:00 a.m. When Beckman got to the apartment, he began knocking rapidly on the door and then started banging on the door. Because it was in the middle of the night and Herman had outstanding warrants for his arrest and dealt drugs at the time, he was nervous to open the door. Herman finally asked who it was, and after Beckman identified himself, Herman opened the door and asked what he was doing there at that time. Herman described Beckman as "very frantic

and nervous." Beckman told Herman and Gabriel that he accidentally shot his best friend, Jacob, three times, while showing him his gun. According to Herman, Beckman was throwing "fake little childish temper tantrums" and "fake crying" while asking Herman and Gabriel for help. Beckman offered Herman $2,000 to help him remove Jacob from the front seat of Beckman's car; Herman declined. Beckman continued asking for help, he asked for towels, a shovel, paper towels, and Herman's blanket. This upset Herman because he felt Beckman was trying to get him involved. Herman testified he and Gabriel told Beckman the best thing to do would be to take Jacob to the hospital, but Beckman replied that he did not want to go to jail. According to Herman, he and Gabriel did not answer the door when Beckman returned about ten to twenty minutes after leaving. At trial, Herman could not recall the exact gun Beckman used to shoot Jacob but recalled it being a 9-millimeter.

Gabriel also testified about Beckman coming to his apartment on March 8th. According to Gabriel, Beckman seemed troubled and was panicking saying he had made a mistake and needed help. When Gabriel refused to go on a drive with Beckman, Beckman told him that he had gotten into a fight with his friend. According to Gabriel, Beckman then said he accidentally killed Jacob by shooting him two to three times, that he "freaked out," and "the gun kept going off." Beckman told Gabriel that Jacob's body was in the front seat of his car, but Gabriel did not confirm. Because of how Beckman was acting—manic and frustrated—Gabriel said he got his own firearm during the conversation. In addition to Beckman asking for trash bags and cleaning supplies, Gabriel also recalled Beckman offering him money to help move Jacob's body. Prior to the incident, Gabriel testified that he and Beckman had gone to a gun range, and while he would not describe Beckman as a gun expert, Beckman was no novice. Gabriel stated he previously sold Beckman a 9-millimeter and an AR-15.

Joseph, who previously lived in an apartment near Herman and Gabriel, testified that he and his wife were outside during the early morning hours of March 8th; Joseph was smoking and playing a game on his cell phone. At some point, Joseph stated he saw Herman and told him he was playing a cell phone game when Herman asked what he was doing. Afterward, Joseph claimed that as he and his wife walked towards a nearby store, they saw blood on the ground where he had previously noticed a black car parked. Joseph recalled the car because while it was parked on the corner, he heard various noises like punching coming from inside the car. Although he could not see anyone, Joseph described it as sounding like a fight between two people. Joseph stayed back from the car because he did not want to get involved. Joseph explained that before he saw the car parked on the corner where he saw the blood, the car had been parked in front of Herman's apartment.

The State called several law enforcement personnel who were involved in the investigation of Jacob's death. Many of them testified to similar facts, but a few had key roles in the investigation. Schertz Police Department Detective Helen Lafitte testified as the lead detective who opened the missing persons case on March 10th after Sylvia reported Jacob missing. Detective Lafitte interviewed Beckman at the police station. Beckman provided different stories as to Jacob's possible location but would never disclose the time or exact place where he dropped off Jacob. Detective Lafitte found it odd that during the interview, when the other detective asked Beckman about Jacob's location, Beckman lowered his head and whispered. Considering his best friend was reported missing for three days, Detective Lafitte described Beckman's demeanor as "pretty carefree and nonchalant."

Beckman also explained to Detective Lafitte that his car was involved in a hit-and-run accident around noon on March 8th causing the airbags to deploy and resulting in a scratch to his

face and a minor bent fingernail, injuries Detective Lafitte had already noted. Beckman told Detective Lafitte that he had his car towed to his mother's business after the accident. After Beckman's interview, Detective Lafitte and another detective drove to Beckman's mother's business to see the car, but the lighting would not allow them to see past the fence.

Former Schertz Police Department Detective Haskell Ivey, now an investigator with the Comal County District Attorney's Office, testified about his efforts to locate and seize Beckman's car. Initially, Detective Ivey located a car parked next to a pressure washer on a trailer at the back of a fenced area at Beckman's mother's business. Detective Ivey could not identify whether the car belonged to Beckman because it was covered with a tarp. Detective Ivey received permission from Beckman's mother to come on the property and look at the car. According to Detective Ivey, Beckman, who was also present, appeared nervous and was stuttering. Beckman begged his mother numerous times to not let Detective Ivey onto the property. Still pleading with his mother to not allow Detective Ivey access to the car, Beckman and his mother accompanied Detective Ivey to the car. Beckman removed the tarp without a request to do so and showed Detective Ivey his car, a Volkswagen Jetta. Detective Ivey observed extensive damage to the front and front passenger side of the car. Concerned that someone was trying to clean up or destroy a crime scene—and after Beckman and his mother tried entering the car through the passenger side door at different times—Detective Ivey stopped them and told Beckman and his mother the car was seized and awaiting the completion of a search warrant.

Beckman was also observed placing items in the trash at the front of his mother's business property prompting Detective Lafitte to go examine the trash and locate any possible evidence. A Volkswagen windshield visor was found in the trash, which later tested positive for the presumption of blood.

While completing the search warrant, Beckman's car was towed to the police department to a secure garage. Detective Ivey noticed water pouring out of the car and tailpipes when the tow truck lifted the car. In his experience, that amount of water coming from a car only occurs when the car has been stuck in a creek, river, tank, or otherwise flooded. As the tow truck unloaded the car at the police station, Detective Ivey noticed more water pouring from the tailpipe, and the tailpipe was clogged with red mud.

Detective Lafitte and Texas State Ranger Conde Benoist searched Beckman's car. Detective Lafitte testified that she observed significant front-end damage to the car and "an overwhelming smell of chemicals similar to bleach." The trunk was bare of any carpeting, any type of cover for the spare tire compartment, or a spare tire. The trunk appeared recently cleaned and empty except for an air freshener used for dehumidifying areas. Inside the car, the airbags had deployed as Beckman told them, but they were also completely cut out and removed as was a large portion of the front passenger seatbelt. Moreover, the car's interior was "significantly wet" or "saturated" to the point the floorboard carpet held water and the cupholders retained a significant amount of liquid that had a cleaning chemical smell. Detective Ivey testified that while he did not conduct the search, he observed many of the same things. The front passenger seat also had staining, and Detective Lafitte found what appeared to be droplets of possible blood, underneath the headrest on the top of the seat and on the back passenger door speaker. Both tested positive as blood, and the blood found on the speaker was determined to be from Jacob. After cutting into the back of the passenger seat, a significant amount of blood was discovered having soaked into the upholstery itself.

Detective Lafitte testified about discovering a large hole in the trim or molding on the pilar between the front and back seats on the passenger side of the car. It appeared the trim had been cut

into with a tool. Ranger Benoist added that after discovering the hole and removing all the trim, he saw that something had struck the back of the now-exposed metal pillar. Following the pillar to its bottom near the floorboard trim, Ranger Benoist found a bullet projectile.

Regarding other parts of the investigation, Detective Lafitte testified that with the assistance of United States Secret Service Special Agent Edward Early, who specializes in cell phone data analysis, Beckman's cell phone data was analyzed. Agent Early testified that data indicated Beckman's and Jacob's cell phones were together near Jacob's residence right before midnight on March 7th. The phones remained together until 12:06 a.m. on March 8th. At that time, the prior consistent activity from Jacob's phone ceased. For approximately two and a half hours, Jacob's phone indicated no activity. The final activity from Jacob phone showed a location in north San Antonio. Agent Early found this odd given the amount of consistent activity from Jacob's phone prior to 12:06 a.m., to absolutely no activity for the two and a half hours, to showing a San Antonio location with no interim change in location or activity.

The analysis of Beckman's cell phone data confirmed he went to Herman and Gabriel's apartment around 1:00 a.m. on March 8th. Then at 2:45 a.m., Beckman's cell phone data indicates his cell phone and Jacob's cell phone—the last activity from Jacob's cell phone—were together at the same place in north San Antonio. Afterward, the data from Beckman's phone showed he drove around San Antonio for a while, including going back toward Herman and Gabriel's apartment, before finally ending at his own apartment around 5:00 a.m. The next day data, including a ride-share application, indicates Beckman traveled to several Walmart locations before leaving his cell phone in the car of his last recorded ride-share. Agent Early testified that upon the discovery of the location of Jacob's remains, cell phone data reflected Beckman, likely using his stepfather's

cell phone, had spent approximately ten minutes at that location near the time of Jacob's disappearance.

Both Agent Early and Detective Ivey identified searches Beckman performed on various devices, including his stepfather's cell phone. Agent Early detected Beckman's locations when he performed these searches—his apartment, Houston, San Antonio, and Laredo. Beckman's searches include: a search for Herman and Gabriel's apartment at 1:09 a.m. on March 8th, what can TSA see when they scan your identification, how does law enforcement ping a cell phone, traveling to Mexico with a warrant, buses from Mexico to Houston, cheap tickets, hotels in Mexico, can a SIM card be tracked, can police see when you buy a bus or plane ticket, can a MacBook be pinged, his name on KSAT 12 news, Texas Department of Criminal Justice, can he travel to Mexico with a warrant as a dual citizen, can you leave the country with a felony warrant, flights to Turkey, flights from Mexico to Turkey, can your phone be pinged when its roaming, and can you get a new passport if you have a warrant. Additionally, other notable searches included whether a burned body can be identified and how to drown a body. Beckman's stepfather's phone that Beckman used near Bulverde where Jacob's remains were found included a search for whether dogs can smell through bleach.

Throughout the trial, Beckman's defense suggested that Garner, Beckman's friend and Jacob's former friend whose relationship with Jacob ended over a conflict with an ex-girlfriend, was also involved in Jacob's death. Nonetheless, Agent Early testified that the data of a phone call from Garner to Beckman during the night of Jacob's disappearance indicated the phones were not next to each other.

To add, searches of Beckman's other devices and digital accounts revealed pictures of Beckman holding a gun wearing a sweatshirt. The time these pictures were taken could not be

determined. Nevertheless, the jury saw pictures of Beckman taken when the police responded to his car being stalled shortly after Jacob's disappearance that show Beckman wearing the same sweatshirt he wore in the pictures holding the gun. The latter pictures show the discolored sleeves of the sweatshirt, as if bleached.

In addition to finding and seizing Beckman's car and observing the search of the car, Detective Ivey investigated Beckman's bank records and investigated receipts that were found during a search of Beckman's residence. Detective Ivey discovered several Walmart receipts showing the purchase of shovels, gloves, water hoses, a lot of bleach, rug cleaner, odor neutralizer and eliminator, tools, lighter fluid, and trash bags. In coordination with Walmart, still photos made from videos of Beckman making these purchases were also entered into evidence. Beckman made these purchases on March 8th through March 10th. On March 11th, Detective Ivey noted Beckman purchased boxes, a travel pillow, a carry-on bag, and a phone charger. Ranger Benoist then discovered Beckman had booked a flight to Turkey but did not board the flight. However, Beckman did go to Mexico, where he was later found and extradited to Texas. Additionally, Beckman texted his mother when Detective Ivey was speaking to her and looking at her phone with permission. Beckman's text read, "Schertz PD is a bunch of bit-- as- pus----."

In September 2022, Jacob's skeletal remains—confirmed by a dentist specializing in forensic dentistry—were discovered after someone found his skull while walking in the woods near Bulverde, Texas. After further investigation, most of Jacob's remains were discovered. An anthropologist testified he could determine trauma occurred to one of Jacob's scapulae and sixth rib, and that his skull endured extensive, high-speed trauma suggesting Jacob had been shot multiple times. A forensic pathologist then opined Jacob's remains indicated he suffered from at least three gunshot wounds. Jacob's manner of death was determined a homicide.

Detective Lafitte testified that an accidental discharge of a weapon occurs when a firearm fires without explanation. However, she stated that in her experience, if there is an accidental discharge, the gun does not fire multiple times but only once. Detective Ivey agreed, testifying that he would anticipate only one shot, not multiple shots, if a weapon accidentally discharged. Furthermore, Detective Lafitte stated that in her training and experience if someone accidentally shot someone, she would expect them to contact 911 or take them to the nearest hospital.

Three of Beckman's recorded jail calls were admitted into evidence and played for the jury. In the first call, Beckman told his ex-girlfriend that he left Jacob with another female and that Jacob was depressed and no longer wanted to be with Holly. The ex-girlfriend did not believe Beckman and asked where Jacob was, but Beckman would not provide a location. The other two calls were between Beckman and his mother. In one, Beckman directed his mother to a box in her laundry room and told her to throw it away immediately. Throughout the call, Beckman instructed his mother to not say out loud what the box contained. During the last call with his mother, Beckman assured her that she should not worry about being investigated in the case because he was the only one that knew exactly what happened that night. He added that all the police had was his car and everything else was circumstantial. Beckman stated that the police did not have anything, and he was one hundred percent sure of that.

*C. Analysis*

Beckman challenges the sufficiency of the evidence to prove he committed the essential elements of murder. First, he suggests Garner was the one to blame for Jacob's death due to Garner and Jacob's contentious relationship over a past girlfriend. However, based on our review of the record, no evidence supports that anyone other than Beckman was with Jacob at the time of his death. Jacob was last seen when he left his house to meet Beckman. Cell phone data supports they

were together near Jacob's house before Jacob's phone ceased activity. Beckman's phone then showed several location changes. Two and a half hours later, Jacob's phone indicated a new location with no activity explaining its movement from the vicinity of Jacob's neighborhood to north San Antonio. Beckman's cell phone data showed it was located at this same north San Antonio location as Jacob's phone and at the same time Jacob's phone indicated its last activity.

Moreover, while Herman's and Gabriel's accounts differ slightly, both testified that Beckman, acting distraught, came to their apartment in the middle of the night asking for help because he shot Jacob. Cell phone data confirmed Beckman was at their apartment at that time. Cell phone data also placed Beckman's stepfather's cell phone, which Beckman was using at the time, at the same location where Jacob's skeletal remains were found not long after Jacob disappeared. The evidence supports the jury's inference that Beckman acted alone and its rejection that Garner was involved in Jacob's murder.

Beckman also argues the evidence is insufficient to prove he acted intentionally or knowingly by shooting and killing Jacob. Both the anthropologist and forensic pathologist testified that Jacob's death resulted from being shot multiple times, including in the head. Beckman initially asked Gabriel for help because he had a fight with his friend. Then he told Herman and Gabriel he shot Jacob. Additionally, both Herman and Gabriel recalled Beckman offering them money to help him with Jacob's body that was in the front seat of his car. Gabriel further explained that while Beckman claimed he accidentally shot Jacob, Gabriel did not understand how Beckman accidently shot Jacob multiple times. Detectives Lafitte and Ivey agreed, both stating that a weapon is not known to accidentally discharge multiple times.

Beckman fled to Mexico, requiring authorities to extradite him back to Texas. Evidence of flight provides circumstantial evidence of Beckman's intentional and knowing murder of Jacob.

*See Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *see also Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007) (stating that a "[factfinder] may draw an inference of guilt from the circumstance of flight"); *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (noting that a finding of intent to kill may be inferred from evidence of flight from the scene).

Additionally, the evidence overwhelmingly indicates that immediately following Jacob's disappearance, Beckman conducted multiple searches related to disposing of a body and fleeing authorities. Beckman purchased a significant amount of bleach and other items that, when considering all the evidence, are associated with disposing of a body as well as cleaning a crime scene. Beckman disposed of Jacob's body in the woods in Bulverde. Beckman then went to great lengths attempting to clean the inside of his car as evidenced by a significant amount of water mixed with a cleaning solution still inside of it when law enforcement searched the car. The trunk was completely empty except for the odor eliminator. Evidence of disposing Jacob's body and then attempting to clean his car of all evidence is also circumstantial evidence that Beckman intentionally and knowingly committed murder. *See Thurston v. State*, 465 S.W.3d 255, 256–57 (Tex. Crim. App. 2015) (Keller, P.J., concurring) (stating that "disposal of the body suggests consciousness of guilt."); *Barron v. State*, 630 S.W.3d 392, 405 (Tex. App.—Eastland 2021, pet. ref'd) (reasoning that attempts to clean up and tamper with the crime scene after shooting two people tended to show a consciousness of guilt). Moreover, Beckman's directives to his mother during the recorded jail calls lend further support to Beckman's consciousness of guilt.

Thus, despite Beckman's contention that he did not intend or desire to cause Jacob's death, the jury could have at least reasonably believed that when Beckman opened fire towards Jacob, Beckman was aware that his "conduct [was] reasonably certain to cause" Jacob's death. *See* TEX.

PENAL CODE ANN. § 6.03(b); *see also id*. § 19.02. When viewing the evidence in the light most favorable to the verdict, we conclude any rational trier of fact could have found that Beckman committed the murder of Jacob beyond a reasonable doubt. *See Witcher*, 638 S.W.3d at 709–10; *see also Jackson*, 443 U.S. at .319.

Accordingly, we overrule Beckman's sufficiency issue.

## MOTION TO SUPPRESS

Next, we address Beckman's suppression issue arguing that the trial court erred when it denied his motion to suppress evidence from the seizure of his car without a search warrant.

A.  *Standard of Review*

"We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review." *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). "[W]e afford almost complete deference to the trial court in determining historical facts," but "we review *de novo* whether the facts are sufficient to give rise to reasonable suspicion in a case." *Id*. at 190. Our deferential review of the trial court's factual determinations also applies to the trial court's conclusions regarding mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). Where the trial court makes express findings of fact, as here, we view the evidence in the light most favorable to those findings and determine whether the evidence supports the fact findings. *See State v. Rodriguez*, 521 S.W.3d 1, 8 (Tex. Crim. App. 2017). Unless the trial court abused its discretion by making a finding not supported by the record, a reviewing court will defer to the trial court's fact findings and not disturb the findings on appeal. *See Miller v. State*, 393 S.W.3d 255, 262–63 (Tex. Crim. App. 2012). We will sustain the trial court's ruling if it is correct on any applicable theory of law and the record reasonably supports it. *State v. Arellano*, 660 S.W.3d 53, 57 (Tex. Crim. App. 2020). Our review

is generally limited to the record at the time of the suppression hearing. *Igboji v. State*, 666 S.W.3d 607, 612 (Tex. Crim. App. 2023).

    *B. Applicable Law*

    The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. Generally, the Fourth Amendment requires that searches and seizures be accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be searched or seized. *Igboji*, 666 S.W.3d at 613 (citing *United States v. Place*, 462 U.S. 696, 701 (1983)). A warrantless search or seizure is *per se* unreasonable under the Fourth Amendment unless it falls within a recognized exception to the warrant requirement. *Id.*

    The plain view doctrine is one such exception. Under the plain view doctrine, law enforcement may seize incriminating objects without a warrant if three requirements are met: (1) law enforcement must lawfully be where the object can be plainly viewed; (2) the incriminating character of the object in plain view must be immediately apparent to law enforcement; and (3) law enforcement must have the right to access the object. *See State v. Betts*, 397 S.W.3d 198, 206 (Tex. Crim. App. 2013); *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009); *see also Horton v. California*, 496 U.S. 128, 136 (1990).

> The "plain-view" doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. A seizure of the article, however, would obviously invade the owner's possessory interest. If "plain view" justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches.

*Horton*, 496 U.S. at 133–34 (citations and footnotes omitted).

The second element—that the incriminating character of the object in plain view must be immediately apparent—requires a showing of probable cause. *See Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991). However, actual knowledge of the incriminating object to be obtained is unnecessary. *Id*.; *see also Horton*, 496 U.S. at 136. The Fourth Amendment does not require a police officer to know that a suspect's property is itself illicit or probative of a crime to take temporary custody of it; but, rather, a police officer must have probable cause to believe that the property is associated with criminal activity. *See Texas v. Brown*, 460 U.S. 730, 741–42 (1983).

*C. Relevant Facts from Suppression Hearing*

The State called two witnesses at the pretrial suppression hearing, Detective Lafitte and Detective Ivey. Beckman called one witness to testify, former Schertz Police Department officer and now firefighter Ryan McCosh (referred to as "Officer McCosh").

Detective Lafitte explained Beckman's car was important because Jacob was last seen entering the vehicle. At the time of the seizure, Jacob had been reported missing for several days. During Beckman's initial interview, Detective Lafitte learned the car had been involved in an accident and then towed to his mother's workplace, raising her suspicions. While Beckman admitted smoking marijuana with Jacob in the car the night of Jacob's disappearance, Detective Lafitte's focus was not on the use of marijuana; it was on Jacob's disappearance. Thus, Detective Lafitte considered the car as evidence involved in possible crime: tampering with evidence and murder. After Beckman told police the location of his car, Detective Lafitte began preparing a search warrant.

Detective Lafitte asked Detective Ivey, who was also present during Beckman's interview, and another detective, Detective Ortiz, to locate Beckman's car because Jacob was last known to have been in Beckman's car, and the car had recently been involved in an accident. Detective Ivey

explained that after he and Detective Ortiz located what he thought could be Beckman's car, he received permission from Beckman's mother for them to come onto her business property. Beckman, present at that time, protested and begged his mother not to allow them access to the property. Beckman ran around, spoke quickly, and was running his hands through his hair. Beckman and his mother walked with Detective Ivey and Detective Ortiz back to the car. Beckman then removed the tarp to show the detectives it was his car. Detective Ivey saw the car had sustained substantial damage to the front and front passenger side.

Prior to arriving at the property to find the car, Detective Ivey noted in his report from Beckman's interview his suspicions of foul play because Beckman told three different stories describing the night out with Jacob and claimed his car had been in an accident. Additionally, while speaking with Beckman and his mother, Detective Ivey learned that the tow truck driver, who recently towed the car to the property, purchased the car and was in route to tow it. Based on his experience and considering that the car may provide evidence into Jacob's missing persons case, Detective Ivey thought Beckman was trying to hide the car under the tarp and get rid of it fast, further adding to Detective Ivey's suspicions.

Beckman opened the front passenger door and attempted to retrieve his sunglasses. Detective Ivey testified he closed the door and told Beckman he could not enter the car, a search warrant was being prepared, and that nothing could be removed from the car. Beckman refused consent to search his car, prompting Detective Lafitte to order a K-9 unit to the scene despite knowing Detective Ivey had already seized the car. Detective Lafitte testified she thought ordering the K-9 unit was appropriate based on the information she had at the time.

Although Detective Ivey had already seized the car, Beckman's mother granted Detective Ivey permission to conduct the K-9 search, and the K-9 made a positive alert on the car.

Nonetheless, Detective Ivey testified that regardless of whether the K-9 positively alerted to the car or not, he was not going to leave the car until it could be searched pursuant to a search warrant because of the potential evidence on or inside the car. Detective Ivey testified the basis of seizing the car was based on possible foul play and a missing person. He seized the car to preserve the evidence as Detective Lafitte obtained the search warrant.

Former Schertz Police Department Officer Ryan McCosh testified he was wearing a body camera during the seizure of Beckman's car. During the recording, Officer McCosh is speaking with Detective Ivey, who is explaining that Beckman is a person of interest and was told not to go into his car because it was seized and the officers were awaiting the execution of a search warrant.

The trial court denied Beckman's motion to suppress and filed findings of fact and conclusions of law. The trial court's findings of fact follow the testimony discussed above. Pertinent to our resolution of Beckman's suppression issue, the trial court found Beckman's mother provided law enforcement permission to come onto her business property and look for Beckman's car. It further found Beckman voluntarily removed the tarp on the car allowing Detective Ivey to not only identify the car as belonging to Beckman but also observe the substantial damage to the car. Given the facts known to law enforcement at the time of the car's seizure— including Jacob's last known location was in the car coupled with Beckman's suspicious behavior during his interview and his inconsistent accounts of what happened—the trial court concluded the facts satisfied several exceptions to the warrant requirement because law enforcement could believe the car was involved in several crimes.

*D. Analysis*

Beckman primarily complains that Detective Lafitte should have obtained a search warrant prior to seizing his car because she had ample time to do so after his interview but before Detective Ivey seized his car.

While we agree that obtaining a search warrant, if possible, prior to a seizure is best practice, given the facts of this case and the testimony at the suppression hearing, several exceptions to the warrant requirement apply here. However, only one is necessary; and thus, we apply the plain view doctrine. *See Igboji*, 666 S.W.3d at 613; *Betts*, 397 S.W.3d at 206.

Detectives Ivey's and Lafitte's testimony supported the trial court's findings that Jacob's last known location was with Beckman in Beckman's car. Beckman was the last known person to see Jacob alive. During his interview, Beckman provided several differing accounts of what happened the night of March 7th and the early morning hours of March 8th. Beckman acknowledged that he and Jacob smoked marijuana that night. Beckman would not provide an exact location where or time when he dropped off Jacob. Beckman's inconsistent statements raised Detective Lafitte's and Detective Ivey's suspicions that something had happened to Jacob that could involve the car. Beckman also told the detectives he had been in an accident and received minor injuries that Detective Lafitte had already noticed. Beckman then explained his car later stalled on the side of the road requiring it to be towed. However, the car was towed to his mother's business, not a repair shop.

Detective Ivey obtained consent from Beckman's mother to come onto her property and look at the car. Thus, the first element of the plain-view doctrine is satisfied. At this time, Detective Ivey witnessed Beckman's odd reaction. Beckman continued imploring his mother to change her mind about letting the detectives onto her property even as they walked to the car. The car was

located at the back of the property, covered with a tarp, next to a pressure washer on a trailer. Beckman voluntarily lifted the tarp off the car revealing the extensive damage to the front and front passenger side. Thus, the third element of the plain-view doctrine is satisfied. Soon thereafter, Beckman attempted to gain entry to the car, prompting Detective Ivey to seize the car, which was then towed to a secure garage at the police station.

Considering the investigation into Jacob's disappearance—specifically law enforcement's suspicions raised during Beckman's interview summarized above, Beckman's odd response when his mother granted the officers permission to come onto her property and look at the car, the car being covered by a tarp, the car damage observed after Beckman removed the tarp, Beckman's attempt to gain entry into the car to remove items, and the fact that Beckman sold the car and a tow truck was on its way to pick it up—we conclude Detective Ivey possessed sufficient probable cause to believe that the car was associated with criminal activity and needed to be seized immediately to avoid any tampering with evidence. *See Brown*, 460 U.S. at 741–42. Thus, the second element of the plain-view doctrine is satisfied.

Therefore, we conclude the evidence presented at the suppression hearing satisfies the elements of the plain view doctrine exception to seize Beckman's car before the search warrant was obtained. *See Betts*, 397 S.W.3d at 206. The trial court did not err when denying Beckman's motion to suppress. *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 65–66 (1992) ("Suppose, for example, that police officers lawfully enter a house, by either complying with the warrant requirement or satisfying one of its recognized exceptions—e.g., through a valid consent. . . . If they come across some item in plain view and seize it, no invasion of personal privacy has occurred."); *Washington v. Chrisman*, 455 U.S. 1, 5–6 (1982) ("The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly

is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be.").

Accordingly, we overrule Beckman's suppression issue.

**LESSER INCLUDED OFFENSE**

Last, we address Beckman's complaint pertaining to the trial court's denial of his request to include the lesser-included offense of manslaughter in the jury charge. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09.

*A. Standard of Review and Applicable Law*

We review a trial court's refusal to submit a lesser-included offense for an abuse of discretion. *Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023). Determining whether a defendant is entitled to an instruction on a lesser-included offense is a two-step inquiry. First, we determine whether the requested charge is a lesser-included offense of the charged offense, and, if so, we must next determine whether the defendant was entitled to the instruction based on the evidence admitted at trial. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011). The first step is a question of law that requires us to compare the elements of the two offenses using the facts alleged in the indictment, not the evidence produced at trial. *Id*.; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.09.

"The second step of the lesser-included-offense analysis is to determine if there is some evidence in the record which would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense." *Rice*, 333 S.W.3d at 145. "[T]he guilty-only requirement is met if there is affirmative evidence of a factual dispute that raises the lesser offense and rebuts or negates other evidence establishing the greater offense." *Chavez*, 666 S.W.3d at 776. Thus, "[t]he evidence must establish the lesser[-]included offense as 'a valid, rational alternative

to the charged offense.'" *Rice*, 333 S.W.3d at 145 (quoting *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)).

"We consider all of the evidence admitted at trial, not just the evidence presented by the defendant." *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). "Anything more than a scintilla of evidence is sufficient to entitle a defendant to [an instruction on a] lesser charge." *Id.* "If there is more than a scintilla of evidence supporting the lesser-included charge, the trial court must include the instruction regardless of whether the supporting evidence is 'strong, weak, unimpeached, or contradicted.'" *Gomez v. State*, 499 S.W.3d 558, 561 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Bell v. State*, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985)). However, "[t]here must be some evidence directly germane to the lesser-included offense for the [factfinder] to consider before an instruction on a lesser-included offense is warranted." *Goad*, 354 S.W.3d at 446.

### B.  Analysis

#### 1.  Is manslaughter a lesser-included offense of murder?

Under the facts of this case, the parties do not dispute that manslaughter is a lesser-included offense of murder. We agree. *Compare* TEX. PENAL CODE ANN. § 19.02(b)(1), (2), *with* TEX. PENAL CODE ANN. § 19.04(a). As charged here, to prove manslaughter, the evidence would have to show that Beckman acted recklessly; however, to prove murder, the evidence would have to show that Beckman acted with specific intent. An offense is a lesser-included of a greater offense if the lesser-included differs from the greater "only in the respect that a less culpable mental state suffices to establish its commission." TEX. CODE CRIM. PROC. ANN. art. 37.09(3); *see also Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012). "A reckless *mens rea* is a less culpable state of mind than that of an intentional [or knowing] *mens rea*." *Guzman v. State*, 188 S.W.3d

185, 190 (Tex. Crim. App. 2006). Thus, manslaughter is a lesser-included offense of murder under the pleading filed in this case. *Id.*; *see also Girdy v. State*, 213 S.W.3d 315, 318–19 (Tex. Crim. App. 2006). The first prong of the test is met.

### 2. *Does the evidence support the lesser-included offense?*

We next "consider whether the evidence shows that if [Beckman] is guilty, he is guilty only of the lesser offense." *Cavazos*, 382 S.W.3d at 382. Thus, there must be affirmative evidence that both raises only manslaughter and rebuts or negates an element of murder. *See id.* at 385. In this case, therefore, affirmative evidence must exist that would permit a jury to rationally find Beckman only engaged in conduct that caused Jacob's death while being aware of but consciously disregarding a substantial and unjustifiable risk that Jacob's death would occur. *See* TEX. PENAL CODE ANN. §§ 6.03(c) (defining "recklessly"); 19.02(b)(1), (2); 19.04(a). The evidence must establish the lesser-included offense as "a valid, rational alternative to the charged offense." *Wade v. State*, 663 S.W.3d 175, 181 (Tex. Crim. App. 2022).

Throughout the course of the trial, Beckman presented the defense that he did not commit an offense. Rather, Beckman's defense suggested that law enforcement mistakenly focused on him instead of investigating Garner, who had a known conflict with Jacob. At no time did the evidence suggest Beckman recklessly shot Jacob multiple times. To the contrary, the detectives' testimony explained that, in their experience, accidental discharges do not cause a gun to fire multiple times. Even Gabriel found it alarming that Beckman claimed it was an accident when Beckman admitted the gun fired several times. In sum, the fact that Jacob sustained multiple gunshot wounds negates Beckman's contention that he was entitled to a manslaughter instruction because Jacob's death was due to an accidental discharge.

Beckman argues that the State's witnesses, Herman and Gabriel, provided the evidence indicating that Beckman did not intend to kill Jacob, rather he accidentally shot Jacob multiple times. However, "[t]he evidence raising the lesser offense must be affirmatively in the record." *Ritcherson v. State*, 568 S.W.3d 667, 671 (Tex. Crim. App. 2018). "That is, a defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be directly germane to the lesser-included offense." *Id*. (internal quotation marks omitted). Here, any absence of evidence of Beckman's intent to kill Jacob is not affirmative evidence supporting the *mens rea* that Beckman recklessly caused Jacob's death. *See Chavez*, 666 S.W.3d at 777 (citation omitted) (providing "mere disbelief of evidence establishing commission of the greater offense is insufficient by itself to justify submission of a [lesser-included offense] instruction. This is because the disbelief of evidence is not evidence"); *see also Ransier v. State*, 670 S.W.3d 646, 651 (Tex. Crim. App. 2023) (stating same, quoting *Chavez*). Rather, as the trial court explained during the charge conference, an accident negates the culpable mental state of intentionally or knowingly that the State must prove to support a murder verdict, which would result in an acquittal. However, an accident does not suggest the victim's death resulted from the defendant being aware of but consciously disregarding a substantial and unjustifiable risk. *See Schroeder v. State*, 123 S.W.3d 398, 401 (Tex. Crim. App. 2003) (providing statements by appellant that "[i]t was an accident" and "I did not mean to" relevant to self-defense but does not allow a finding of recklessness).

We therefore find no affirmative evidence of a factual dispute that raises the lesser offense and rebuts or negates other evidence establishing the greater offense. *See Chavez*, 666 S.W.3d at 776; *see also Cavazos*, 382 S.W.3d at 385 ("Meeting this threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and

rebuts or negates an element of the greater offense."). Accordingly, based on the evidence admitted at trial, we cannot conclude the trial court abused its discretion by failing to submit an instruction on the lesser-included offense of manslaughter to the jury. *See Chavez*, 666 S.W.3d at 776.

Accordingly, we overrule Beckman's lesser-included offense issue.

## CONCLUSION

Having overruled all of Beckman's appellate issues, we affirm the trial court's final judgments of conviction for murder and tampering with evidence.

Irene Rios, Justice

DO NOT PUBLISH